# DAYTONA BEACH COMMUNITY COLLEGE v LEAVITT

## Case No. 87-4937

State of Florida, Division of Administrative Hearings

April 15, 1988

## APPEARANCES OF COUNSEL

J. Dana Fogle, Fogle & Fogle, P.A., for petitioner.

Jason G. Reynolds, Cobel, Barkin, Rothert, Gordon, Morris, Lewis & Reynolds, P.A., for respondent.

## OPINION OF THE COURT

CHARLES C. ADAMS, Hearing Officer.

### *RECOMMENDED ORDER*

Notice was provided and on February 9-12, 1988, a formal hearing was conducted in this cause pursuant to Section 120.57(1), Florida Statutes. The location of the hearing was the Daytona Beach Community College, Daytona Beach, Florida. This recommended order is being entered following a review of the exhibits and the transcript of proceedings. In addition, Petitioner's proposed recommended order has been considered. In some instances the factual suggestions set forth in

the Petitioner's proposed recommended order have been utilized. Otherwise, those factual proposals are distinguished in an appendix which is attached to this recommended order. Respondent did not offer a proposed recommended order. She did offer, through counsel, what is in effect a written closing argument. That argument has been considered in the preparation of the recommended order. These submissions by the parties were made in keeping with the opportunity afforded counsel to offer a written statement by way of a proposed recommended order filed within ten days of March 16, 1988. Although these proposals were received by the Division of Administrative Hearings on March 28, 1988, for Respondent and March 29, 1988, for Petitioner, they are accepted.

## PRELIMINARY MATTERS

As a product of an internal audit, Petitioner, Daytona Beach Community College, by action of Charles Mojock, Director of Human Resources within the community college, brought action calling for the suspension and possible termination of the Respondent, Amanda Leavitt, as a tenured faculty member with Daytona Beach Community College. The specific allegations related to the alleged improper conduct are set forth in the charge letter of October 12, 1987, containing five charges.

With the advent of the charges, Respondent was afforded the opportunity to select one of two alternatives to defend against the accusations. These alternatives included a hearing before a Division of Administrative Hearings Hearing Officer upon referral by the Board of Trustees or before a review committee of faculty sitting as qualified officers. This latter alternative would consist of five impartial tenured faculty members not within the division within which the Respondent was employed, the names of those impartial tenured faculty members being taken from a list of ten tenured instructors recommended by the faculty.

Respondent, through correspondence of October 21, 1987, elected to have a Hearing Officer with the Division of Administrative Hearings consider this case. In turn, on November 3, 1987, the Petitioner's president, Dr. Charles H. Polk, requested the assignment of a Hearing Officer by the Director of the Division of Administrative Hearings. That request was honored and a hearing date was established for February 9, 1988. At the suggestion of counsel, additional days of hearing were added, expanding the hearing dates from February 9-12, 1988.

On October 23, 1987, two additional charges were placed against the

Respondent as set forth in correspondence of that date. Those amendatory charges were drawn by Charles R. Mojock.

On the appointed dates for hearing, consideration was given to the five original charges set forth in the October 12, 1987 charging letter and the two additional charges as announced in the October 23, 1987 correspondence.

In the course of the formal hearing, Petitioner presented the testimony of 22 witnesses and offered 129 exhibits which were received, excepting part of Exhibit 110. Respondent, in defense of the accusations, introduced the testimony of 8 witnesses and offered 124 items of evidence all of which, save Exhibit 120, were received. Respondent was presented as a prosecution witness and in her own defense.

## ISSUES

The issues as alluded to in the Statement of Preliminary Matters and as will be more completely described in the course of this Recommended Order concern the question of whether the Respondent has committed offenses as a tenured instructor with the Petitioner, Daytona Beach Community College, which would cause disciplinary action to be taken against her, to include termination?

## FINDINGS OF FACT

### Background Facts

1. Petitioner, Daytona Beach Community College, is an educational institution within the State of Florida charged with the responsibility of providing post-secondary education. To that end, it operates in accordance with the rules of the State Board of Education and State Board of Community Colleges and such rules, procedures and policies as its board of trustees would deem appropriate. Among the responsibilities of that board of trustees would be the hiring and firing of employees, to include instructional staff. See Section 240.319, Florida Statutes.

2. Respondent, Amanda Leavitt, is an employee of the Daytona Beach Community College. She is a tenured faculty member. She holds the position of instructor and has been in a continuing contract position since August 17, 1981. Respondent, in addition to being an instructor, is the program manager in the Dental Assisting Program within the Division of Health, Human and Public Service Occupations of the Daytona Beach Community College. She had been an active member of the faculty until October 8, 1987, when she was suspended based upon the allegations that form the basis of this dispute. That suspension has remained in effect pending the outcome of the proceedings involving the charges at issue.

168

3. The description of the procedural events that brought about the hearing in this case as set forth in the preliminary matters statement within this Recommended Order are incorporated as facts.

4. The Petitioner, through its charges of October 12 and 23, 1987, has given sufficient notice to the Respondent to allow her to prepare and defend against those accusations.

5. Respondent made a timely request for formal hearing in this case.

6. This case began following complaints made by a number of students undergoing training in the Dental Assisting Program in the academic year 1986-1987. Specifically, on June 11, 1987, these students, approximately twelve in number, met with the chairman of the Allied Health Department and program manager for the Respiratory Therapy Program, Charles Carroll, to describe their sense of dissatisfaction with certain circumstances within the Dental Assisting Program. Out of that conference, Carroll pursued the matter with Respondent, Leavitt, and the Petitioner employed the offices of its internal auditor, Tom Root, to ascertain information about the contentions made by the students. Among other matters being examined by the auditor, was a question concerning the collection of money from the students within the Dental Assisting Program in that academic year, unrelated to the normal fee collections associated with enrollment at the Daytona Beach Community College. In furtherance of his task, the auditor prepared Internal Audit #83, which is constituted of the majority of Petitioner's exhibits. The audit was concluded on September 24, 1987, and contained twelve specific findings. Those findings, which were not favorable to the Respondent, formed the basis of her suspension on October 8, 1987, and underlie the five charges dating from October 12, 1987. Further investigation was done by the auditor subsequent to September 24, 1987, and that continuing investigation and certain conduct by the Respondent which the Petitioner regarded as actionable led to the two supplemental charges of October 23, 1987.

7. Mr. Carroll had given the Respondent certain instructions concerning the allegations made by the students in which he sought the Respondent's assistance in clarifying what had occurred within the program and rectifying any problems that might exist. He was not satisfied with her response, as to the timeliness or the comprehensiveness of her reply to his instructions. The internal auditor in the face of Respondent's remarks about the funding dispute related to the payment of monies by the students sought to verify those observations by the Respondent by contact with members of the Dental Assisting Class in the academic year 1986-1987 and met with a considerable difference of

**169**

opinion between those students and the Respondent. This led the auditor to believe that the Respondent was being less than candid in her relation of events, so much so that the audit critical of the Respondent ensued.

8. There is now related a discussion of the specific charges made against the Respondent:

*Charges 1 and 2 (October 12, 1987)*

(1) Misconduct in office in the form of collecting and allowing those under your supervision to collect funds from students under false pretenses (i.e. claiming that these funds were lab fees) also the sale by you and those under your supervision of college program supplies, class handouts, and textbooks during the 1985-86, and 1986-87 school years. These collections were in violation of college policies and procedures and also violated the Code of Ethics of the Education Profession in Florida, principle one, concerning instructor's responsibilities for dealing justly and considerately with each student and avoiding exploitation of professional relationships with students.

(2) Misconduct in office in the form of the existence of a cash shortage of approximately $400.00 together with a total lack of records as to the disposition of these funds which were collected from dental students during the Fall semester 1986-87 and the improper depositing of some of these funds in an off-campus account during the Fall semester 1986-87.

9. The academic year 1987-1987 was constituted of the Fall semester in 1986, the Winter semester in 1987 and a shortened semester described as a Spring semester in 1987. In that school year Respondent was issued contracts for the period August 18, 1986 through May 1, 1987 and May 5, 1987 through June 29, 1987. This included approximately one week of employment prior to the students coming on campus in the Fall of 1986 and two weeks beyond the time of their final exams in the Spring term of 1987.

10. The 1986-1987 Daytona Beach Community College Catalog describing the Dental Assisting Program had a reference to an estimated cost for a "lab kit" as being $50. This was the first time that any such reference had been made in the college catalog. In addition, within the Dental Assisting Student Handbook related to the Dental Assisting Program published for the Fall of 1986, there was a similar reference to the "lab kit . . . $50" fee. This had not been referenced in the student handbook for the academic year 1985-1986. The reference

170

for "lab kit . . . $50," was again stated in the student handbook for the Winter term 1987.

11. These remarks in the publications concerning the "lab kit . . . $50" were placed under the auspices of the Respondent.

12. The origins of the reference to the $50 amount came about when the Respondent and another employee of the Daytona Beach Community College, Sharon Mathes, had visited Santa Fe Community College in Gainesville, Florida, and observed that the students in a similar dental assisting program to that of the Daytona Beach Community College program had individual laboratory kits. Respondent and Mathes then discussed that it might be beneficial to have individual laboratory kits for the students in the Daytona Beach Community College program. This individual disbursement in their mind might assist in the preservation of the school's property and teach responsibility on the part of the students.

13. The materials that were to be placed in the kit for the academic year 1986-1987 were purchased through the ordinary purchase order process for the provision of supplies for the Dental Assisting Program at school expense. This was a process in which an inventory check was made and necessary implements to fill out kits for an anticipated student enrollment of 25 participants were purchased.

14. In this planning, a discussion was entered into between Respondent and Mathes concerning the question of whether the students should repurchase those materials that had been paid for through the ordinary expenditures associated with the program. Specifically, Respondent had made mention of the fact of the students buying the contents. However, it was never decided that they would buy those materials based upon a decision made between the Respondent and Mathes. Mathes surmises that it was not decided because the cost of those materials would be in excess of $70-75, an amount which exceeded the "lab kit . . . $50." The students did purchase the container or art box into which the materials were placed. This purchase was made from the campus bookstore and was not part of the $50 fee.

15. At the commencement of the academic year 1986-1987, their uncertainty remained as to' the use of any $50 amount to be collected from each student, reference the "lab kit." Respondent and Mathes had discussed the fact that, if the students returned laboratory kit items and some were missing or broken, that some of the money that had been gained from the students might be used to replace those items and avoid having to issue further purchase orders to be paid for by the

**171**

Daytona Beach Community College for the replacement of those items that were no longer available for use. It was also discussed that the money might be used to offset other expenses such as costs of graduation, to send a student to a seminar, or possibly establishing a fund for students that may become financially stricken and might not be able to complete the program without financial assistance directed toward their tuition. There had also been discussion of reimbursement of monies not used for these general purposes, but no amount was arrived at concerning reimbursement. In the final analysis, the impression that Mathes was given out of these discussions was that the money would be used in the program and dispensed however it might be needed.

16. In any event, it was determined by the Respondent and Mathes that $50 additional money over and above other fees authorized by the Daytona Beach Community College would be collected for each student participating in the Dental Assisting Program in the 1986-1987 academic year. It was explained to the students the $50 additional cost, a product of the Respondent and Mathes unrelated to authorized collections through the Daytona Beach Community College, was an additional cost item. The students were told that if it were a fee that was too much, they would have the opportunity to drop out of the program. Thus, the fee was presented as a mandatory fee. At the orientation at the beginning of the academic year 1986-1987, Respondent and Mathes, participated in the explanation about the $50 charge. The presentation by the Respondent and Mathes pointed out to the students that the $50 extra cost described as "lab kit-$50" was related to materials such as plaster that the students would employ in their course work and to defray expenses associated with graduation. The impression given to the students was that the materials were being rented or leased. The explanation given was that the $50 amount must be paid before graduation. In furtherance of this purpose, Respondent and Mathes continued to pursue the collection of this $50 amount from the students through the Fall term 1986.

17. Laboratory fee amounts were collected from 16 students. Nine students paid the amount by check and seven through cash payments. The checks totalling $450 and cash in the amount of $50 was deposited in an off-campus bank account, unauthorized by the Daytona Beach Community College. This account was described with the Sun Bank of Volusia County, Daytona Bech, Florida, as DBCC Student Dental Assistants' Association. Checks by the students were made over to the Dental Assisting Program of DBCC or Daytona Beach Community College.

172

18. There were $300 in funds collected from the students which had not been deposited into the bank account, and the exact whereabouts of those funds has not been established. The money collected and deposited and that which is accounted for had been held in an area of the physical plant related to the Dental Assisting Program to which faculty and students had easy access. Placement of the $50 fees on the grounds of the Daytona Beach Community College included placement in a cigar box in a file drawer and one $50 cash payment was kept or maintained separately in Respondent's desk drawer for what is described on the receipt given to that student as ". . . for cash." That student was Susan Woodstock. That $50 was part of the $300 which has not been explained in terms of its ultimate disposition.

19. Respondent has contended that these $50 collection were in the way of club dues similar to those that had been collected in years previous for students participating in the Dental Assisting Program, as recently as the academic year 1985-1986. In that year and other years as well which predate 1986-1987, the students had paid incremental dues, usually $5 per month, for participation in a club. On the occasion of the academic year 1986-1987, collections for participation in a student club were not made. Therefore, the $50 amounts paid were unrelated to club dues. Having considered the facts in this case, it is evident that the Respondent was award that the $50 collections from the 16 students were not associated with club dues.

20. Respondent also participated in and condoned the unauthorized sale of X-ray film and pencils to the students in the academic year 1986-1987 and in other school years. These monies were collected in the way of petty cash maintained in envelopes in the Respondent's desk or in a cigar box maintained in another area. No receipts were given concerning the collection of these monies and no records were maintained.

21. Mary Reep, a dental assisting student at Daytona Beach Community College in the academic year 1985-1986 paid $5 for the student handbook associated with that course work. This handbook should have been provided without paying her program instructors. The payment was made to the Respondent and Mathes who were participating in the sale of the handbook. Reep also observed other people purchase the student handbook in that year. Mathes participated in other sales of handbooks than the transaction with Reep in the academic year 1985-1986, Fall semester. On this occasion, Respondent remarked to Mathes that if the community college knew of this collection of $5 for the handbooks, Respondent would be "fired." This

**173**

practice of the sale of the handbooks continued in the academic year 1986-1987, at which time a number of students purchased the Fall 1986 student handbook from the Respondent and Mathes. During the time that Mathes had been working in the Dental Assisting Program, this had been the common practice, i.e. the collection of funds for the student handbook. On every occasion, the students had been entitled to be provided a student handbook without charges beyond those authorized by the Daytona Beach Community College. The community college had not allowed for additional charges by faculty placed against the students when distributing the student handbooks.

## Charge 3 (October 12, 1987)

Misconduct in office for your intentional overpayment of assistants for work not performed by them during December 1985 and January 1986.

22. On August 28, 1985, Respondent wrote to Charles Carroll, her supervisor, and asked, among other things, that two instructors be hired to help manage and oversee 24 students. This related to making available two persons who had a familiarity with the University of Florida's dental school, at which the students would be involved in an externship program commencing in January, 1986, or the Winter term of the academic year 1985-1986. In turn, Carroll referred this to his superior, Dr. Lynn O'Hara, describing the transport and involvement in the Winter term. This memo to Carroll from O'Hara is of September 9, 1985. On September 16, 1985, O'Hara wrote a memo to Carroll in which it was indicated that one position could be approved to be shared by two persons, if the hiring did not commence during the Fall term.

23. Nonetheless, Respondent arranged for and took Denise Dorne and Kim Rockey to the dental school in Gainesville, Florida on December 18, 1985, during the Fall semester. No indication was made in the Respondent's request for leave that she would intend to take Dorne and Rockey. Respondent followed this trip by including eleven hours of paid time for the December 18, 1985 trip for Dorne and Rockey on their initial pay request for the month of January, 1986, which was signed by the Respondent. In effect, these two individuals had, contrary to the instructions of the Respondent's superior, been allowed to undertake activities at a time which they were not authorized to participate as employees in the Dental Assisting Program at Daytona Beach Community College.

24. Dorne and Rockey were paid for eight trips made for class participation in the Winter term of 1986 in the externship at the dental

174

school in Gainesville, Florida, as shown in pay requests that were signed and submitted by the Respondent for the benefit of those employees. This action by the Respondent was taken knowing that the two individuals had not attended one of the sessions in Gainesville. This circumstance is mitigated by the fact that the Respondent had the two individuals undertake other assignments of equal value to make up for the nonattendance at the externship session.

### Charge 4 (October 12, 1987)

Willful neglect of duty and misconduct in office for your absence without authorized leave and failure to perform your duties on January 23, 1986 for which you received pay; your failure to teach all classes as indicated on your Load Letter as your teaching responsibility during the Fall semester 1986; and Absence without Leave and failure to fulfill prescribed duties for the period of June 22 through June 29, 1987, for which you received pay.

25. On January 15, 1986, Respondent made request for annual leave for January 24 and 27, 1986, which was approved. She also determined to take leave and absent on January 23, 1986, without authorization. On January 23, 1986, she was on a ski trip in North Carolina.

26. The fact of her being away from the Daytona Beach Community College is acknowledged in a slip found within the Petitioner's Exhibit 32 in which she says, "I had leave on 1/23/86." This references the reason why she is not seeking to collect money for participation in the externship at the dental school in Gainesville, Florida on that date as discussed in Petitioner's Exhibit 32.

27. Related to this nonattendance, Respondent has been less than forthcoming. Only when confronted with details by way of evidence demonstrating her whereabouts on January 23, 1986, that is, Banner-elk, North Carolina, did she reluctantly acknowledge not being at her job on January 23, 1986. The impression given is that she deliberately took time off from her employment on January 23, 1986 without permission.

28. An item referred to as a Load Letter forms the basis of describing the requirement of an instructor with the Daytona Beach Community College to teach the number of hours and the courses, at the prescribed time as set out in that document. This is the bargain which the instructor makes with the community college. The Fall semester 1986 Load Letter indicates that the Respondent was to teach Class #1671 on Monday morning at 11:00 to 11:53 and Class #1669 on Monday afternoon from 1:00 to 4:53. Contrary to her obligation,

**175**

Respondent did not teach those classes. Instead, she used Sharon Mathes to teach Class #1671 (dental anatomy) on Wednesday morning and Class #1669 (biomedical sciences) on Monday afternoon at its scheduled time. The reason for changing the dental anatomy class slot was to accommodate the students by not causing them to be confronted with too much in the way of difficult material on Monday, and which would have also placed them in the position of not being prepared for a Tuesday afternoon laboratory which needed a lecture class by way of predicate.

29. Sharon Mathes was paid as an instructor in the Fall 1986 term in her dental materials class, taught on Monday morning. She received a different classification of pay at a lesser rate for the classes taught which had appeared on the Respondent's Load Letter, Class #1671 and Class #1669. Respondent was also paid as the instructor teaching those classes listed on Respondent's Load Letter. The student evaluations forms related to Class #1671 and Class #1669 taught by Mathes in the Fall term 1986 show the Respondent's name as the instructor providing contact hours with the students in those two classes. Moreover, in a part-time instructional monthly report and salary voucher related to Class #1671, Respondent indicates that she taught this course on Monday morning, when in fact it was taught on Wednesday morning by Sharon Mathes. This part-time instructional report relates to an overload payment beyond the basic salary structure associated with Respondent's duties under contract, which are to teach a load of 15 hours. The first 15 hours of that 17 hours came under her normal salary structure and included Class #1669.

30. Respondent's protestations that this arrangement in the Fall of 1986 in which Mathes taught classes on the Respondent's Load Letter, Mathes was paid at a rate not commensurate with service as an instructor, evaluations were made by students related to an instructor who did not teach them, Respondent was paid for her normal teaching load and an overload for classes not taught were items contemplated by the accreditation arrangement with the American Dental Association and countenanced by the Daytona Beach Community College are unavailing. These arrangements which Respondent made concerning her responsibilities for teaching in the Fall 1986 were misleading, unauthorized and contrary to her employment agreement with the community college.

### Charge 5 (October 12, 1987)

Gross insubordination for your failure to comply with DBCC Procedure #1091 which requires your cooperation with the College

176

as it attempted to determine the accuracy of the various allegations made against you by the students and the additional matters described above which were discovered by the College Administration during its investigation.

31. In the aforementioned meeting of June 11, 1987 between students in the Dental Assisting Program and Charles Carroll, a discussion was entered into concerning the payment of the $50 fees which has been described as the "lab kit-$50." Other complaints were aired as well, leading Carroll to focus on the overall program and the "lab kit" cost in particular. To this end, Carroll contacted the Respondent on the same date and discussed his concerns with her. Following that meeting, among the instructions given by his memorandum of June 15, 1987, Carroll told Respondent to immediately dissolve the student association and to provide a detailed accounting of the disposition of club assets as he had had those described to him by the Respondent. He informed the Respondent that she should operate student club activities under the guidelines established by the Student Government Association on campus. In addition, he asked the Respondent to meet with him before the school year concluded, that is the school year 1986-1987, so that they might review the student handbook and grading policies. Respondent was instructed to bring copies of those materials for his records.

32. Related to the checking account which was associated with the Sun Bank, Respondent explained to Carroll in the June 11, 1987 meeting that checks were outstanding and although she did not indicate that checks would have to be written to conclude other expenses within the academic year, she did describe that those expenses were forthcoming. This discussion about expenses pertains to a check written to K-Mart on June 9, 1987 in the amount of $19.89 for Cross pens for two dentists associated with the Dental Assisting Program in recognition of that association; a check written in the amount of $52.30 to the Belleview Florist on June 9, 1987 for flowers for the graduation dinner for the students in the 1986-1987 class, and a check that would be written to Marker 32 in the amount of $155.35 for costs of the graduation dinners, that check being written on June 12, 1987. The checks of June 9, 1987 cleared the bank on June 11, 1987, and the June 12, 1987 check cleared the bank on June 16, 1987. Ultimately, a balance was left in the account of $127.18.

33. Following the June 11, 1987 meeting, Respondent informed Carroll that she was waiting for the last bank statement before closing out the account. Petitioner's Exhibit 115 is the last bank statement rendered with an ending balance of $130.18 from which $3 was deducted, leaving the balance of $127.18. The ending balance reflects

177

the date June 30, 1987. Prior to the rendering of this bank statement, on June 23, 1987, Carroll had written to the Respondent and told her that it was unacceptable for her to wait for the normal statement of ending balance and expressed his belief that the bank would provide a final accounting upon closure of the account. In this case, the proof is missing on whether the bank would have provided an accounting at the closure of the account following the clearing of the last check on June 16, 1987. As of June 30, 1987, when the account ending balance was established, Respondent was between school years and not under active employment by the Petitioner. She did not take any action to close the account in June and July, 1987.

34. Nor did the Respondent provide a copy of the student handbook; instead, she excerpted three pages from that handbook and gave those to Carroll.

35. Carroll was unable to find the Respondent on campus during the work week June 22 through June 25, 1987, and wrote a memorandum on June 29, 1987 referring to the fact that he had made several attempts to contact her and noting that she was unavailable in her office and not subject to contact at her home. He admonished her about not being in attendance or on authorized leave, and by his remarks referred to the need to discuss urgent matters. In fact, Respondent, as alluded to in Charge 4, was not at her work place June 22 through June 25, 1987 and had not been granted permission to miss that time.

36. On July 15, 1987, beyond the contract year, Respondent was written by Carroll in which he references his correspondence of June 15 and 23, 1987, and complains about the failure to provide evidence that the Student Dental Assisting Association has been dissolved, and that an accounting has been made related to what he refers to as "club assets." He also indicates that he did not feel that the Respondent was cooperating in providing requested information.

37. On July 23, 1987, Charles R. Mojock wrote to the Respondent referring to the fact that he did not believe that the bank account related to the Student Dental Assisting Association was legal, and that he believed it was contrary to State statute and to community college policy, based upon his discussion with others in the administration at the community college. As a consequence, he reminded the Respondent that, the sooner the funds were removed from that account, the easier it would be to settle the matter. He recounts in this memorandum what he believed to be a problem with the Respondent's compliance with the requests related to the account. The memorandum is basically concilia-

178

tory indicating that it was not intended to make accusations, but to resolve the problem.

38. Eventually on August 3, 1987, Respondent wrote to Tom Root, the auditor at the community college, and apprised him of her willingness to provide information that he sought upon his return from leave. This return to his job was supposed to occur on August 12, 1987. On August 13, 1987, the Respondent turned over to Root the balance of the funds in the Sun Bank account by cashier's check which was credited to the Community College Foundation account and a receipt given to the Respondent. Those funds were left to be used for the benefit of needy dental assisting students. The amount of cash found within the instructional area of the Dental Assisting Program, was $15.08.

39. Respondent also provided the auditor with an item dated August 3, 1987, on stationery of the Daytona Beach Community College, referred to as a Student Dental Assistant 1986-1987, listing officers and the comment that dues were collected in the amount of $5 per month as the source of revenue. This reference to $5 dues as already found is false. It goes on to state that no fund-raising had been undertaken. It states, "I do not think there were any fund-raising activities." This is taken to men what the Respondent asserted, according to this document. Under "expenditures," there is a reference to open house refreshments, Halloween party, buffet lunch, gifts for speakers, flowers and cards for classmates, reference books from the book rack, donation of a magnifying glass, graduation flowers and dinners.

40. On August 18, 1987, the internal auditor wrote to the Respondent requesting additional information related to receipts for the funds paid by the students in the 1986-1987 year and bank statements. He opines in this memorandum that the Respondent either was misunderstanding his request or was misrepresenting the way the funds were collected.

41. Respondent replied to the memorandum of August 18, 1987 by a memorandum of August 20, 1987 and through a phone conversation with the auditor. In the memorandum by the Respondent, she indicates that she was unaware that funds were collected by Mathes until after the fact, meaning the $50 collection and that the students had been misled about the intent of the funds in their student account. This contention in the memorandum of August 20, 1987 is patently false and is seen as thwarting the efforts on the part of the auditor to discern the true facts of the matter. Respondent was aware of the $50 fee collection. Other suggestions within the memorandum refer to the fact

that she had been told that part of the funds were to be used for replacement of lost items in the lab kit pertaining to the students, and from there came the phrase "lab kit rental." She talks in terms of the fact that the students were aware that the money was being used for name tags, open house, doctor's gifts and graduation. She states that this strongly suggests that the dues were mandatory. She goes on to describe that Ms. Mathes, once she left, had no records of who had or had not paid, and no effort was made to collect unpaid dues, and the fact that this was the obligation of the student treasurer. All of these comments were apparently designed to deflect the attention away from the true status of the matter, which included the fact that no student dues were collected in the amount of $5, that the Respondent was thoroughly acquainted with the collection of the $50 fee amounts for use of laboratory materials and graduation, and that the student treasurer had no part to play in the collection of these $50 fees or the deposit of those sums. By contrast, Respondent had been involved in the collection of fees and the endorsement of checks and payment of those fees which were deposited. Furthermore, her disclaimer of having knowledge of what was on the front of the checks she endorsed in terms of the reason for the $50 checks being written, five in number and that she only endorsed the backs without a knowledge of the reason for the checks is incredulous. The facts of this case lead to the conclusion that Respondent did know what those five checks were for.

42. The Respondent was also in possession of Exhibit 42 offered by her at the hearing which showed a list of student signatures reflecting both those who had not paid and subsequent dates of when the students had paid. This exhibit was not revealed to the auditor during his investigation, though such information was sought by the auditor. It only became a matter within his knowledge on February 8, 1988.

43. The memorandum of August 20, 1987 by the Respondent indicates having discussions with the students concerning ways to use the money that had been given for the laboratory kits or fee and the fact that it was decided that a certain workbook referred to as a Core Packet should not be assigned, meaning in the future, but be used as a reference in the future. This Core Packet had been purchased by the students for course work in the amount of approximately $40 and ordered from an off-campus bookstore. Additional copies remained from the order that had been placed with that bookstore, and these were purchased from that store known as the Campus Bookrack, six Core packets in all at the expense of $17808 taken from the Student Dental Assisting account at the Sun Bank. Contrary to the memorandum and her testimony, the students had no knowledge of this

180

purchase and did not condone it. Neither did the students condone the purchase of a magnifying glass to be used for the sharpening of dental instruments in one of the classes related to this program. The memorandum says the students agreed that alighted magnifying glass would help them in sharpening instruments, and discussion between Respondent and the students led to the students donating that magnifying glass. No discussion of this nature was held with the students as outlined in the memorandum of August 20, 1987, and described in testimony by the Respondent at hearing. Respondent did spend $47.20 in the purchase of the magnifying light.

44. In summary, Respondent had been involved with the establishment of the $50 extra fee as listed in the 1986-1987 college catalog and in the Fall 1986 and Winter 1987 student handbooks, but she failed to advise the auditor about this or that she was present while it was being discussed with the students at orientation in the Fall of 1986 or that she had endorsed checks comprising the initial deposit of the $50 collections in the bank account. This together with other items as described greatly impeded the efforts of the college at determining the reason for the $50 charge, who was responsible for placing the charge and who among the students had paid the money. The principal manifestation of the impediment was experienced by the internal auditor when all sixteen students who paid the $50 fee held a different and generally consistent viewpoint from that of Respondent concerning the fee and its usage. This lead to additional effort by the auditor in ascertaining the true facts.

### Charge 6 (October 23, 1987)

Gross Insubordination for your willfully altering information related to the College's investigation, which is in violation of DBCC procedure #1091. In support of this charge, the following witnesses; Mr. Robert Schreiber, Mr. Charles Carroll, Mr. Tom Root, Ms. April Pulcrano, and Mr. Charles R. Mojock will testify that they were present (or in telephone contact) during the discussion regarding the possibility of your tendering your resignation. They will refute your statement that you were informed that if you did not resign, "the case would be turned over to the State Attorney for a theft prosecution." They will further refute that you were told "that this was extremely important so that the College could cover the alleged fund shortage from detection by state auditors."

45. On October 8, 1987, counsel for the Respondent wrote to the Board of Trustees of the Daytona Beach Community College and discussed his interest in reconciling the differences between the parties

amicably. In that correspondent, there is found the following reference ". . . Early in the school year, Mrs. Leavitt was notified by several of her superiors that, if she did not resign, her case would be turned over to the State Attorney for a theft prosecution. In addition, she was told that this was extremely important so that the college could cover the alleged fund shortage from detection by state auditors." This is an attorney's attempt to state his client's position and from this event the prosecution seeks to have the Respondent found insubordinate. Having considered the testimony of Charles Carroll, Robert Schreiber and Chuck Mojock, together with the Respondent, there is clearly a difference of opinion about what was said in various meetings between the Respondent and administration officials within the community college. On balance, the exact facts may not be found which describe insubordination for remarks found within correspondence by counsel for the Respondent attributable to his client.

## Charge 7 (October 23, 1987)

Misconduct in office for your use of part-time employees and a student teacher to teach a substantial portion of your assigned instructional load during the Winter of 1987. Specifically, the College will show that the externship program (Section 1667) with local dentists' offices, was conducted totally by Ms. Elizabeth Switch and Ms. April Pulcrano. In addition, Ms. Switch taught Practice Management (Section 1664) and Ms. Pulcrano taught Preventive Denistry and Nutrition (Section 1665). Ms. Pulcrano will testify (and students enrolled in the Externship course will confirm this fact) that only she and Ms. Switch made visits to the local externship sites, and that Ms. Pulcrano had responsibility for writing up the reports, meeting with students, and assigning grades for this course.

Ms. Pulcrano will further testify that you approached her during the first week of the Fall term in this academic year and asked her to teach the Dental Anatomy and Physiology course, but to be paid at the staff assistant pay rate instead of the appropriate adjunct instructional pay rate.

46. The number of hours on the Load Sheet pertaining to the Respondent for the Winter term 1987 showed 14 semester hours for which courses are set out. Respondent routinely taught only one of those classes, Chairside Assisting II, on Fridays from 10:00 a.m. until noon. This was two lecture hours and two hours of contact. The remaining four contact hours for laboratory, which equated to two semester hours of the four total hours associated with Chairside Assisting II, Course #1666, were not done by the Respondent. As the

182

Load Letter contemplates, the laboratory was done by an adjunct instructor.

47. On the Load Letter for Winter 1987 and in keeping with the continuing contract entered into on August 17, 1981 and at subsequent times Respondent should have taught the remaining courses reflected on her Load Letter for the Winter semester 1987. One of those courses was Course #1664, Practice Management, a course for which she was entitled to receive an overload payment, according to the Load Letter. Respondent turned in the overload pay sheet for that course certifying that she had taught the class, when in fact Elizabeth Switch, a part-time instructor, taught that class and was paid for her work.

48. In this same term, Winter 1987, April Pulcrano, a student from the University of Central Florida, served as a student teacher in the Dental Assisting Program. She was hired by the Respondent to teach Chairside II laboratories on Monday afternoon and on Wednesday afternoon. She also was made responsible for externship of students during the Winter semester consisting of her visitations to dental offices where the students had been placed to gain clinical experience as part of their studies at the community college. Pulcrano's involvement in the externship included administrative paperwork, involving forms of evaluation which the dental offices made of the performance of students who were externed. She summarized and provided grades to the externship students in this program. These activities by Pulcrano were done on a routine basis in which she was primarily responsible for the externship program with assistance one day a week on the part of Elizabeth Switch. The externship program involving six semester hours and 12 contact hours per week in Course #1667 was the responsibility of the Respondent, according to her Load Letter in the Winter term 1987. Respondent had initial contact with this responsibility on the first day that the students were dispatched to various dental offices throughout Volusia County, Florida, and some occasional contact beyond that point. This involvement by the Respondent did not approach the kind of responsibility contemplated by the assignment in her Load Letter.

49. A course on the Load Letter of Winter 1987 related to the Respondent was what is referred to as Prevention and Nutrition, Course #1665. This is a two hour course with two contact hours. This course was taught by Pulcrano and not the Respondent.

50. Respondent did not assist Pulcrano in the laboratory portion of a Chairside Assisting II class, and the Respondent placed Pulcrano into the class without introduction or explanation. As with the circum-

stances related in Charge 4, the failure to teach courses on the Load Letter pertaining to the Fall semester 1986, Respondent had not been relieved of the necessity to teach her courses reflected in the Load Letter pertaining to the Winter semester 1987.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction over the subject matter and the parties to this action in accordance with Section 120.57(1), Florida Statutes.

2. The overall responsibility for the operation of the Daytona Beach Community College is reposed in its District Board of Trustees. This responsibility includes appointing, employing and removing personnel. See Section 240.319, Florida Statutes. That same section allows the District Board of Trustees of the Daytona Beach Community College to adopt rules, procedures and policies need to operate the community college.

Section 240.335, Florida Statutes, addresses the question of employment of personnel in the community college upon recommendation of the president and subject to any rejection by the Board of Trustees and to the rules and regulations of the State Board of Education related to such matters as tenure, leaves of absences and remuneration and other conditions of employment by the State Board of Community Colleges deemed necessary and proper and also subject to the policies of the Board of Trustees that are not inconsistent with the requirements of law. Within that section, reference is made to the fact that an internal auditor employed by the community college shall be hired by the Board of Trustees at the community college and report directly to that board. Rule 6A-14.247(6), Florida Administrative Code, by the Board of Community Colleges speaks to the powers and duties of the Board of Trustees of the various community colleges, to include the Daytona Beach Community College, to provide for the suspension and dismissal of its employees.

The foundation contract pertaining to the Respondent's tenure rights, dating from August 17, 1981, reminds the Respondent that she is held accountable to the laws, Florida State Board of Education Regulations, and policies and regulations of the Board of Trustees of the Daytona Beach Community College that were existing at that time and those that might be lawfully enacted or promulgated in the future. In this connection, Respondent is answerable in complying with the Florida Statutes, and rules of the Florida State Board of Education, State Board of Community Colleges and Board of Trustees of the Daytona Beach Community College in effect during the relevant times

184

contemplated by this prosecution. She is also accountable for complying with the terms of any internal policies and procedures associated with the Daytona Beach Community College in existence at the time that the contract for tenure came into effect on August 17, 1981, and that continued to exist beyond that point up through the relevant periods being inquired about in this case and any amendments to existing policies and procedures or new policies and procedures which were enacted subsequent to that date and of which Respondent received a copy.

Daytona Beach Community College Policy #1.02 in effect on August 17, 1981 and at times relevant to the inquiry calls for the Respondent to comply with the Federal and State laws, State Board of Education regulations, policies of the District Board of Trustees and other policies, regulations, memoranda, bulletins and handbooks pertaining to her duties with the college. It also states that the Daytona Beach Community College Procedures Manual established to implement policies shall have the force and effect of a board policy as approved by the District Board of Trustees of the Daytona Beach Community College. Finally, it speaks in terms of procedures promulgated by lower administrative officials of the college incorporated in the procedures manual, treating those incorporated references as amendments and revisions to the procedures manual.

Rule 6A-14.411(6), Florida Administrative Code, by the State Board of Community Colleges, allows the Board of Trustees of the Daytona Beach Community College to suspend or dismiss the Respondent for misconduct in office, gross insubordination and willful neglect of duty. These are the principal grounds for prosecution in this case. This prosecution theory is further carried forward in Daytona Beach Community College Procedure #4050 and Policy #4.05, in effect on August 17, 1981, and at relevant times beyond that point. These references contemplate the ability of the Respondent to gain a hearing as envisioned by Rule 6A-14.411(6), Florida Administrative Code, or through grievance procedures associated with the Daytona Beach Community College. In this instance, Respondent elected a hearing pursuant to the rule's provision, which contemplated a hearing by a Hearing Officer with the Division of Administrative Hearings, upon referral by the community college. Respondent made a timely request for this choice of hearing forum. The case was referred to the Division of Administrative Hearings and the hearing was conducted.

## Charge 1

Misconduct in office in the form of collecting and allowing those

**185**

under your supervision to collect funds from students under false pretenses (i.e. claiming that these funds were lab fees) also the sale by you and those under your supervision of college program supplies, class handouts, and textbooks during the 1985-86, and 1986-87 school years. These collections were in violation of college policies and procedures and also violated the Code of Ethics of the Education Profession in Florida, principle one, concerning instructor's responsibilities for dealing justly and considerately with each student and avoiding exploitation of professional relationships with students.

## Charge 2

Misconduct in office in the form of the existence of a cash shortage of approximately $400.00 together with a total lack of records as to the disposition of these funds which were collected from dental students during the Fall semester 1986-87 and the improper depositing of some of these funds in an off-campus account during the Fall semester 1986-87.

Respondent was guilty of misconduct in office in participating in and allowing action by Sharon Mathes to collect unauthorized $50 fees from the students in the class in the academic year 1986-1987. The portion of the fees collected for materials, dealt with items which had already been paid for by the community college. The portion of the fees used for graduation costs accrued to the benefit of the students but was the product of an arrangement that left the students without the ability to decline to participate. This arrangement for fee collection was not one that followed the requirements of Chapter 240.363, Florida Statutes, which called for funding accruing to the benefit of the community college to be received, accounted for and expended as contemplated by rules and regulations of the State Board of Education, concerning the balance left in the bank account and at the Dental Assisting Program office.

Respondent was guilty of misconduct in office in that the effect of her activities in the collection of the $50 so-called lab fee amounts from the students were such that $300 is unaccounted for. There are simply no records. Not only is this general misconduct on her part for the failure to account for or keep records reference that $300, but she has violated the statutory and procedural provisions already described in addressing Charges 1 and 2. Respondent was also guilty of misconduct for the sale of film and pencils.

In the same respect, Respondent is guilty of misconduct in office by her participation in the sale of and condoning the participation of

186

Sharon Mathes in the sale of student handbooks in the academic years 1985-1986 and 1986-1987, as well as other years.

Finally, the collection of funds pertaining to the student handbook and the pencils did not comply with the Daytona Beach Community College Procedure #7121 for the maintenance of petty cash and change funds in effect on August 17, 1981 and at times relevant to this inquiry. Respondent violated that provisions as well in holding a lab fee payment from Susan Woodstock in what is seen as a petty cash arrangement.

### Charge 3

Misconduct in office for your intentional overpayment of assistance for work not performed by them during December 1985 and January 1986.

Respondent is guilty of misconduct in office in that she condoned the payment of money to assistants within her program in activities in December, 1985, when those persons were not employees of the Daytona Beach Community College. This refers to Dorne and Rockey. Likewise, Respondent is guilty of misconduct in being involved in the payment of those two employees for trips which they did not make to Gainesville, Florida to the University of Florida dental school in the Winter term of the academic year 1985-1986.

### Charge 4

Willful neglect of duty and misconduct in office for your absence without authorized leave and failure to perform your duties on January 23, 1986 for which you received pay; your failure to teach all classes as indicated on your Load Letter as your teaching responsibility during the Fall semester 1986; and Absence without Leave and failure to fulfill prescribed duties for the period of June 22 through June 29, 1987, for which you received pay.

Respondent neglected her duty and was guilty of misconduct in office for her absence from her job on January 23, 1986, and on June 22-29, 1986, without authorization to take leave. Interpretation of her acts is in keeping with the case of *School Board of Collier County v Steele*, 348 So.2d 116 (Fla. 1st DCA 1977), which held that absence without permission to take leave is considered willful neglect of duty or misconduct in office. In addition, in accordance with Rule 6A-14.434, Florida Administrative Code, Respondent for these absences without authorization for leave forfeits compensation for that time and is subject to dismissal. Daytona Beach Community College Procedure #4190 and Policy #4.19, in effect on August 17, 1981 and on the

187

dates of her absence, instruct the Respondent to gain authorization before being absent from duty and call for the forfeiture of compensation and the possible suspension or termination for nonattendance on duty days.

Respondent is guilty of misconduct in office and failing to teach all classes indicated on her Load Letter as being her teaching responsibility in the Fall semester of 1986. By her action she failed to meet the terms of Section 240.341, Florida Statutes, related to the teaching of 15 minimum contact hours per week in a setting in which she had not received permission to deviate from that requirement. This failure was also violative of her continuing contract. In this circumstance related to this Fall semester 1986, Respondent had sought extra payment for teaching an overload as envisioned by Daytona Beach Community College procedure #2080 in effect on August 17, 1981, and in the Fall semester 1986, Course #1671, which was taught by another employee, Sharon Mathes, who was also paid by the community college in the time slot where the class was given. This performance of duties by Sharon Mathes was at a rate of pay other than that for an instructor, although Mathes was performing the duties of an instructor.

See also Daytona Beach Community College procedure #2122 in effect on August 17, 1981, and the Fall semester 1986, which describes the fact that an overload corresponds to teaching more than 15 credit hours per term, as was the case with the Respondent in what was contemplated in her Load Letter wherein Course #1671 was an overload course.

### Charge 5

Gross insubordination for your failure to comply with DBCC Procedure #1091 which requires your cooperation with the College as it attempted to determine the accuracy of the various allegations made against you by the students and the additional matters described above which were discovered by the College Administration during its investigation.

Reference to Daytona Beach Community College procedure #1091 found within Charge 5 is taken to mean Daytona Beach Community College procedure #1090 based upon the facts presented and assessment of the underlying basis for prosecution. That provision, which was in effect on August 17, 1981 and at all relevant periods to this inquiry, makes it incumbent upon an employee such as Respondent to cooperate in fact-finding procedures, such as undertaken by her superior, Mr. Carroll, and by the auditor, Mr. Root. In the preliminary phases of this circumstance in which those individuals sought to

ascertain the events related to the fee collection from the students in the Dental Assisting Program in the academic year 1986-1987, Respondent did not cooperate. In terms of the procedure in question, Respondent intentionally withheld information and under that rule this is considered insubordination. That insubordination is seen as being actionable under Rule 6A-14.411, Florida Administrative Code. The Respondent withheld information about her personal knowledge of the event related to the $50 fee collections from the students. Respondent went so far as to not only give oral statements which were misleading, but to fabricate written information which was designed to thwart the attempt of the administration in finding out the true facts.

While the events related to the direct instructions given to the Respondent by her superior, Mr. Carroll, concerning the provision of information showing the closure of the bank account related to the dental assisting program do not lead to the conclusion that she was grossly insubordinate to that person; the tardiness in the provision of the banking information is seen as part of the attempt on her part to forego scrutiny of those matters and as part of the overall gross insubordination on her part.

## Charge 6

Gross Insubordination for your willfully altering information related to the College's investigation, which is in violation of DBCC procedure #1091. In support of this charge, the following witnesses; Mr. Robert Schreiber, Mr. Charles Carroll, Mr. Tom Root, Ms. April Pulcrano, and Mr. Charles R. Mojock will testify that they were present (or in telephone contact) during the discussion regarding the possibility of your tendering your resignation. They will refute your statement that you were informed that if you did not resign, "the case would be turned over to the State Attorney for a theft prosecution." They will further refute that you were told "that this was extremely important so that the College could cover the alleged fund shortage from detection by state auditors."

Petitioner has failed to prove that Respondent committed any violations as alleged in this charge.

## Charge 7

Misconduct in office for your use of part-time employees and a student teacher to teach a substantial portion of your assigned instructional load during the Winter of 1987. Specifically, the College will show that the externship program (Section 1667) with local dentists' offices, was conducted totally by Ms. Elizabeth Switch and

**189**

Ms. April Pulcrano. In addition, Ms. Switch taught Practice Management (Section 1664) and Ms. Pulcrano taught Preventive Denistry and Nutrition (Section 1665). Ms. Pulcrano will testify (and students enrolled in the Externship course will confirm this fact) that only she and Ms. Switch made visits to the local externship sites, and that Ms. Pulcrano had responsibility for writing up the reports, meeting with students, and assigning grades for this course.

Based upon the discussion in Charge 4 related to the Fall semester 1986 concerning the theory of prosecution, authority for prosecution, Respondent is also guilty of misconduct in office in her failure to comply with her Load Letter and teach the courses contemplated for her instruction in the Winter term 1987. Again in the Winter term 1987, Respondent not only allowed others to teach part of her teaching load but claimed payment for overload teaching when that course was being taught by another instructor.

Based upon the full consideration of the facts found and the conclusions of law reached, it is

RECOMMENDED:

That a final order be entered terminating Amanda Leavitt's employment with the Daytona Beach Community College and providing for the forfeiture of her pay received for January 23, 1986 and January 22, 1987 through January 29, 1987.

DONE and ENTERED this 15th day of April, 1988, in Tallahassee, Florida.